**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Case No. 17-24514-BKC-EPK |
| THOMAS FREDERICK SCHMIDT SR., | Chapter 7 |
| Debtor. | |
| WALMOL HOLDINGS, LLC, MARC SPORN and MEDI BIOTECH, LLC, | Adv. No. 18-_____-BKC-EPK-A |
|     Plaintiffs, | |
| vs. | |
| THOMAS FREDERICK SCHMIDT SR., | |
|     Defendant. | |

## COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT

Creditors Walmol Holdings, LLC, Medi Biotech, LLC and Marc Sporn (collectively, "Plaintiffs") file this Complaint against Debtor Thomas Frederick Schmidt Sr. ("Debtor") pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4) and 523(a)(6), and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, and state:

## THE PARTIES, JURISDICTION AND VENUE

1. On December 4, 2017 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code.

2. The section 341 meeting of creditors was held on January 10, 2018.

3. Plaintiff Walmol Holdings, LLC ("Walmol"), a creditor of Debtor, is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.

4. Plaintiff Medi Biotech, LLC ("MediBiotech"), a creditor of Debtor, is a Florida

limited liability company with its principal place of business in Palm Beach County, Florida.

5.      Plaintiff Marc Sporn ("Sporn"), a creditor of Debtor, is an individual residing in Palm Beach County, Florida, and principal of Walmol and MediBiotech.

6.      Debtor is an individual residing in Palm Beach County, Florida.

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

8.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I) and (O).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTS SUPPORTING THE CLAIMS

### Plaintiffs' Vehicles Misappropriated by Debtor and Schmidt Auto

10.      Pre-petition, Plaintiffs purchased and acquired the following vehicles:

(a)      1974 DeTomasso Pantera vehicle, VIN THPNND06627 (the "1974 Pantera"), purchased by Walmol for $56,500.00 from Sharkey's Automotive in Miami, Florida.

(b)      1971 Porsche 911E vehicle, VIN 9111200156 (the "1971 Porsche"), purchased by MediBiotech for $85,300.00 from Classic Car Gallery in Southport, Connecticut.

(c)      1974 Porsche 911 vehicle, VIN 91141112506 (the "1974 Porsche"), purchased by Walmol for $19,386.00 from Brau Investments, LLC in Neptune Beach, Florida.

(d)      1967 Lincoln vehicle, VIN 7Y86G6803217 (the "1967 Lincoln"), for $39,215.00 from Daniel Schmitt & Co. of St. Louis, Missouri.

(e)      1987 Porsche 2d Cabriolet vehicle, VIN WPOEB0937H5070141 (the "1987 Porsche"), for $100,000.00 from WOCM, Inc.

11.      The five vehicles identified above shall be referred to herein as the "Vehicles" unless otherwise stated.

12.      On or about January 1, 2015, Walmol began renting a warehouse located at 1220 Tangelo Terrace, Bays A 20 & 21, Delray Beach, Florida (the "Delray Warehouse"), for storage

of the Vehicles. Prior to this date, Walmol had rented bays at 1220 and 1240 Tangelo Terrace, Delray Beach, Florida, for storage of its vehicles.

13.     On December 15, 2015, Sporn, Walmol, Debtor and Schmidt Auto Sales, Inc., Debtor's wholly-owned company now subject to its own pending chapter 7 bankruptcy, case no. 17-24515-EPK ("Schmidt Auto"), entered into a joint venture agreement for the purchase and sale of vehicles for profit (the "Joint Venture"). The Vehicles were not part of the Joint Venture but, rather, vehicles owned by Plaintiffs as identified above that had been acquired separate and apart from the Joint Venture and were stored by Plaintiffs at the Delray Warehouse.

14.     To carry out the business of the Joint Venture, Schmidt Auto occupied a portion of the Delray Warehouse as an auto dealer to engage in the purchase and sale of vehicles for the Joint Venture.

15.     The Vehicles were previously stored at Walmol's prior rented warehouse in Delray Beach, Florida, prior to the Joint Venture and Schmidt Auto's occupancy of a portion of the Delray Warehouse. The Vehicles remained at the Delray Warehouse until they were unlawfully removed therefrom by Debtor and Schmidt Auto, as described below, on or about February 27, 2017.

16.     At some time unknown to Plaintiffs, Debtor and Schmidt Auto apparently caused all of the Vehicles to become encumbered by liens that secured loans from Nextgear Capital, Inc. ("Nextgear") under Schmidt Auto's "floor plan financing" agreement with Nextgear, which, upon information and belief, totaled more than $200,000.00.

17.     Plaintiffs have no knowledge as how Debtor and Schmidt Auto used the proceeds from their sale of the Vehicles. Plaintiffs contend, however, that the Vehicles could not properly

3

be encumbered by Nextgear's financing liens because those vehicles were not owned as part of the Schmidt Auto inventory.

18.    On February 27, 2017, Debtor and Schmidt Auto falsely represented to Sporn, knowing that Sporn would inform Walmol and MediBiotech, that the Vehicles were repossessed and towed from the Delray Warehouse to satisfy the Nextgear liens that encumbered the Vehicles.  Debtor told Sporn that the Nextgear loans were in default and the Vehicles were going to be auctioned off by Nextgear through an auctioneer in Orlando, Florida known as "Manheim" and operated by Manheim Remarketing, Inc. ("Manheim Orlando").  Debtor's statements were false as the Nextgear loans had not yet come due and payable, and the Vehicles were towed at the direction of Debtor and Schmidt Auto, not Nextgear, to be sold at auction for the benefit of Debtor and Schmidt Auto.

19.    Upon information and belief, Debtor and Schmidt Auto directed Alicia L. Loy ("Loy"), a Schmidt Auto employee, to execute documents to effectuate a transfer or attempted transfer of the Vehicles to Schmidt Auto to pledge the Vehicles to secure the Nextgear loans and then sell the Vehicles.  Upon information and belief, Loy was acting on behalf of Schmidt Auto at the direction of Debtor in executing such documents.

## 1974 Pantera

20.    Upon information and belief, Debtor and Schmidt Auto caused Loy to forge the name of Antonio Ilardo ("Ilardo") as seller on a purchase agreement for the 1974 Pantera. According to the apparently forged purchase agreement, Ilardo sold the 1974 Pantera to Schmidt Auto for $75,000.00 on October 19, 2013.  The purchase agreement listed the address for Schmidt Auto as the Delray Warehouse (1220 Tangelo Terrace, Bays A 20 & 21, Delray Beach,

Florida).

21.     The purported sale of the 1974 Pantera to Schmidt Auto could not have occurred October 19, 2013, however, as Schmidt Auto did not occupy the Delray Warehouse (the address listed on the purchase agreement) on that date.  In fact, the 1974 Pantera was purchased by Walmol on December 8, 2014, subsequent to that purported sale date.

22.     Upon information and belief, Schmidt Auto did not pay $75,000.00 to Ilardo or to anyone else as represented in the apparently forged purchase agreement.

23.     Upon information and belief, at some time unknown to Plaintiffs, Debtor through Schmidt Auto pledged the 1974 Pantera to secure a $49,495.00 floor plan loan from Nextgear. However, the Nextgear lien does not appear to have been recorded with the Florida Department of Motor Vehicles.

24.     Further, the 1974 Pantera title shows a purported assignment by Ilardo to Schmidt Auto (at the Delray Warehouse), dated October 19, 2013, which also appears to be forged.  Upon information and belief, Debtor directed Loy to forge the title assignment on behalf of Schmidt Auto for the benefit of Debtor and Schmidt Auto, and the 1974 Pantera has never been validly titled in the name of Schmidt Auto.

25.     Walmol has since discovered that Schmidt Auto sold the 1974 Pantera to a dealer in Pennsylvania, through an auction at Manheim Orlando, despite the fact that Schmidt Auto did not own the vehicle or have valid title.

## 1971 Porsche

26.     By a purchase agreement dated December 9, 2016, Schmidt Auto represents that it paid Walmol $75,000 to purchase the 1971 Porsche.  Though Schmidt Auto did pay $42,000.00

to Walmol – claiming that it was an advance as there was a buyer for the vehicle – neither Walmol nor Medi Biotech signed any documents to effect the sale, and this anticipated sale did not take place.  The purchaser listed on the bill of sale for this transaction was Medi Biotech, not Walmol, and the vehicle was never transferred by Medi Biotech to Schmidt Auto or Walmol; therefore, Walmol could not have validly transferred the 1971 Porsche to Schmidt Auto since it never owned that vehicle.

27.     The identity of the person signing the purchase agreement, on behalf of the seller, for the 1971 Porsche is not disclosed, and the seller is not disclosed as being a representative or agent of either Walmol or MediBiotech.

28.     Neither Walmol nor Medi Biotech authorized the sale of the 1971 Porsche to Schmidt Auto, and they believe that the signature for the alleged seller on the purchase agreement to be a forgery.  Upon information and belief, this signature was forged by Loy acting at the direction of Debtor for the benefit of Debtor and Schmidt Auto.  Upon information and belief, the 1971 Porsche was sold through Manheim Orlando by Schmidt Auto to Cars of Manheim, Inc. d/b/a Motorgroup ("Motorgroup"), an auto dealer in Delray Beach, Florida believed to be an affiliate of Manheim Orlando and whose principal is a friend of Debtor.  Upon information and belief, Motorgroup is still in possession of this vehicle.

## 1974 Porsche

29.     Walmol's title to the 1974 Porsche shows Walmol as owner and is still in the name of Walmol.  However, a purchase agreement dated April 16, 2016, purports to sell the vehicle from Walmol to Schmidt Auto for $70,000.00, by and through Walmol's principal, Michelle Larkin ("Larkin"). The purported signatures of Larkin, on behalf of Walmol as seller,

both on the purchase agreement and the assignment of title for the 1974 Porsche, are not the signatures of Larkin nor did she authorize her signature to be placed on these documents.  Upon information and belief, Debtor directed Loy to forge these documents for Schmidt Auto for the benefit of Debtor and Schmidt Auto.  Schmidt Auto did not pay $70,000.00 to Walmol for the 1974 Porsche.

30.    Upon information and belief, the 1974 Porsche was also sold by Schmidt Auto to Motorgroup through an auction conducted by Manheim Orlando.  However, Walmol did not execute any documents to effectuate that sale and Debtor did not pay the purported purchase price to Walmol.

31.    Walmol as title holder, after several requests to Manheim Orlando and Nextgear, obtained possession of the 1974 Porsche in late September, 2017, but the vehicle was damaged. Upon information and belief, this vehicle was in the possession of Motorgroup, but later was returned to Manheim Orlando or Nextgear because valid title could not be delivered to Motorgroup.

**<u>1967 Lincoln</u>**

32.    By an affidavit for correction on title ("Lincoln Affidavit"), which purports to bear the signature of a representative of Daniel Schmitt & Co. of St. Louis, Missouri, Schmidt Auto apparently attempted to have the title issued to Schmidt Auto rather than Walmol.  The signature that appears in script appears to be that of Daniel Schmitt.

33.    The notary who notarized the Lincoln Affidavit is Loy, who works for Schmidt Auto and did not indicate whether she knew the identity of the person whose signature she notarized or that identification was produced, as would be required for a notary to properly

notarize a signature.  Further, upon information and belief, Daniel Schmitt lives in Missouri and was not personally in Florida.

34.    By a purported bill of sale dated January 23, 2015, the same 1967 purchased by Walmol was sold by Daniel Schmitt & Co. to Schmidt Auto.  Upon information and belief, this bill of sale is a forgery.  In fact, Daniel Schmitt, the principal of Daniel Schmitt & Co., has executed an affidavit attesting that the signature of seller's agent on this bill of sale is a forgery.

35.    The purported signature of Larkin on the Lincoln Affidavit and bill of sale for the 1967 Lincoln (on behalf of Walmol) is not her signature, and she did not authorize these documents to be signed on her behalf.  Upon information and belief, Debtor directed Loy to forge these signatures on behalf of Schmidt Auto for the benefit of Debtor and Schmidt Auto.

36.    Daniel Schmitt did not sign the Lincoln Affidavit, and has signed an affidavit attesting that the signature that does appear on the Lincoln Affidavit is not his signature and is a forgery.

37.    Walmol received no funds from the sale of the 1967 Lincoln, and discovered that Debtor attempted to sell the 1967 Lincoln to Motorgroup, who took possession of the vehicle but later returned it to Manheim Orlando and/or Nextgear.  After several demands, this vehicle was returned to Walmol in late September, 2017, but had been damaged.

38.    The 1967 Lincoln is titled in the name of Walmol and was never titled in the name of Schmidt Auto.

## 1987 Porsche

39.    By a purchase agreement dated November 30, 2016, the 1987 Porsche was purportedly transferred from Walmol to Schmidt Auto for $135,000.00.  The purported signature

of the seller on this agreement, whose identity or capacity to sign on behalf of Walmol is not disclosed thereon, appears to be a forgery as it is not Larkin's signature and she did not authorize her signature on this document.  Upon information and belief, Debtor directed Loy, his employee, to forge this purchase agreement for Schmidt Auto for the benefit of Debtor and Schmidt Auto.

40.    Schmidt Auto did not pay Walmol $135,000.00 as set forth in the purchase agreement for the 1987 Porsche.  Upon information and belief, Schmidt Auto sold this car to Motorgroup, through an auction conducted by Manheim Orlando, which is in possession of that vehicle.

41.    While Walmol has received insurance proceeds pursuant to a settlement with the insurer for the 1987 Porsche, to mitigate a portion of its damages, it still has remaining damages due to Debtor's misappropriation of this vehicle as described above.

42.    Upon information and belief, shortly after the apparent fraudulent transfers of the Vehicles to Schmidt Auto, accomplished through the various forgeries described above, Debtor and Schmidt Auto borrowed funds from Nextgear which loans were purportedly secured by the Vehicles as collateral.

43.    Upon information and belief, Debtor and Schmidt Auto received Nextgear loans in the amount of $18,000.00 for the 1967 Lincoln and $82,650.00 for the 1987 Porsche, and additional funds from the loans secured by the other Vehicles. To the knowledge of Plaintiffs, no liens on the Vehicles were recorded on behalf of Nextgear with the Department of Motor Vehicles.

44.    Plaintiffs were not aware that the Vehicles were purportedly encumbered by liens

until February 27, 2017, when Debtor falsely informed Sporn that the vehicles were repossessed by Nextgear in respect of its alleged liens on the Vehicles.

45.   Debtor has refused to return the 1987 Porsche, the 1971 Porsche and the 1974 Pantera to Plaintiffs, as the rightful owners of those Vehicles, despite numerous requests for same.

46.   Schmidt Auto sold or attempted to sell the five (5) Vehicles without the consent (and over the specific objection) of Plaintiffs and refused to return the Vehicles to Plaintiffs after their demand for same.  Upon information and belief, Debtor and Schmidt Auto hastily sold the 1987 Porsche, 1971 Porsche and 1974 Pantera for amounts substantially less than the fair market value and/or appraisal value for those vehicles, and attempted to sell the 1974 Porsche and the 1967 Lincoln for substantially less than fair market value.

## Debtor's Misappropriation of Joint Venture Funds

47.   Under the Joint Venture, Debtor and Schmidt Auto were to purchase and sell vehicles on a retail and wholesale basis in the name of Schmidt Auto.  Debtor and Sporn were to split the net profits and neither Joint Venture partner nor Schmidt Auto was entitled to receive any other remuneration, commissions or compensation except for said division of profits.

48.   Debtor, the sole owner and principal of Schmidt Auto, was to use his expertise in auto sales and as a dealer to maximize the profits of the Joint Venture in the purchase and sale of motor vehicles.

49.   From September through December, 2015, Sporn and Walmol loaned a total exceeding $850,000.00 to the Joint Venture pursuant to the parties' agreement.

50.   Debtor and Schmidt Auto failed to use their expertise to operate the Joint Venture

and lost all of the monies loaned by Sporn and Walmol to the Joint Venture.

51.     Upon information and belief, the lost funds are attributable to diversion of monies from the Joint Venture by Debtor as well as his and gross mismanagement, theft, and other causes attributable to Debtor's actions or omissions.

52.     Upon information and belief, Schmidt Auto maintained two bank accounts and transferred funds from the operating account of Schmidt Auto to a second account, which Debtor used for personal expenses in violation of the Joint Venture agreement, including but not limited to significant improvements to his residence, and for payment of personal credit card bills.

53.     Sporn and Walmol reposed trust and confidence in Debtor and Schmidt Auto, who had superior knowledge and experience in the purchase and sale of motor vehicles, to operate the Joint Venture for the benefit of all Joint Venture partners and to not utilize Plaintiffs' loan proceeds for their personal benefit, or for any purpose other than operation of the Joint Venture.

54.     Debtor and Schmidt Auto assured Plaintiffs that the Joint Venture would be operated to generate a profit and that funds would not be used or diverted to either Debtor or Schmidt Auto, and that Plaintiffs' loan proceeds and monies derived from sales would be used for operation of the Joint Venture.

55.     Upon information and belief, the representations that Debtor and Schmidt Auto made to Plaintiffs – that they had expertise to generate profits and not divert monies to their personal use – to induce Plaintiffs to loan funds to the Joint Venture and execute the Joint Venture agreement were false, and Debtor and Schmidt Auto knew they were false at the time they were made.

56.     Debtor and Schmidt Auto specifically induced Plaintiffs to execute the Joint Venture agreement and loan funds to the Joint Venture, and Plaintiffs relied upon said misrepresentations to their detriment.

## COUNT I

### Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)

57.     Plaintiffs incorporate by reference and reallege the allegations contained in paragraphs 1 through 56 of this Complaint.

58.     Pursuant to 11 U.S.C. § 523(a)(2), a discharge in a chapter 7 case does not discharge a debtor from any debt obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

59.     As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently obtained title to and sold (or attempted to sell) the Vehicles rightly belonging to Plaintiffs, without their permission or authorization, for his personal profit and gain to the exclusion and harm of Plaintiffs.

60.     As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently induced Plaintiffs Sporn and Walmol to enter into the Joint Venture and loan more than $850,000.00 to the Joint Venture, then squandered and/or diverted all or a significant portion of those funds for their personal profit and gain to the exclusion and harm of Plaintiffs and the Joint Venture.

61.     The debt owed by Debtor to Plaintiffs arising from the acts and conduct alleged herein arose from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition," such that it is excepted from Debtor's

chapter 7 bankruptcy discharge under 11 U.S.C. § 523(a)(2).

WHEREFORE, Plaintiffs request that the Court enter a judgment excepting their claims from Debtor's discharge pursuant to 11 U.S.C. § 523(a)(2) and granting such other and further relief as the Court deems just and proper.

## Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4)

62.    Plaintiffs incorporate by reference and reallege the allegations contained in paragraphs 1 through 56 of this Complaint.

63.    Pursuant to 11 U.S.C. § 523(a)(4), a discharge in a chapter 7 case does not discharge a debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

64.    As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently obtained title to and sold (or attempted to sell) the Vehicles rightly belonging to Plaintiffs, without their permission or authorization, for his personal profit and gain to the exclusion and harm to Plaintiffs.

65.    As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently induced Plaintiffs Sporn and Walmol to enter into the Joint Venture and loan more than $850,000.00 to the Joint Venture, then squandered and/or diverted all or a significant portion of those funds for their personal profit and gain to the exclusion and harm of Plaintiffs and the Joint Venture.

66.    A trust relationship existed between Debtor/Schmidt Auto and Plaintiffs Sporn and Walmol with respect to the Joint Venture and, as such, Debtor/Schmidt owed a fiduciary duty to Plaintiffs with respect to the Joint Venture which they violated by the acts and conduct

described above.

67.    The debt owed by Debtor to Plaintiffs arising from the acts and conduct alleged herein arose from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," such that is excepted from Debtor's chapter 7 bankruptcy discharge under 11 U.S.C. § 523(a)(4).

WHEREFORE, Plaintiffs request that the Court enter a judgment excepting their claims from Debtor's discharge pursuant to 11 U.S.C. § 523(a)(4) and granting such other and further relief as the Court deems just and proper.

**Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6)**

68.    Plaintiffs incorporate by reference and reallege the allegations contained in paragraphs 1 through 56 of this Complaint.

69.    Pursuant to 11 U.S.C. § 523(a)(6), a discharge in a chapter 7 case does not discharge a debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

70.    As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently obtained title to and sold (or attempted to sell) the Vehicles rightly belonging to Plaintiffs, without their permission or authorization, for his personal profit and gain to the exclusion and harm to Plaintiffs.

71.    As alleged herein, Debtor, acting individually and/or on behalf of Schmidt Auto, fraudulently induced Plaintiffs Sporn and Walmol to enter into the Joint Venture and loan more than $850,000.00 to the Joint Venture, then squandered and/or diverted all or a significant portion of those funds for their personal profit and gain to the exclusion and harm of Plaintiffs

and the Joint Venture.

72.     Debtor had no justification for his fraudulent misappropriation of the Vehicles and, in doing so, Debtor intended to injure Plaintiffs or knew that injury was substantially certain to result from his acts.

73.     The debt owed by Debtor to Plaintiffs arising from the acts and conduct alleged herein arose from "willful and malicious injury by the debtor to another entity or to the property of another entity," such that is excepted from Debtor's chapter 7 bankruptcy discharge under 11 U.S.C. § 523(a)(6).

WHEREFORE, Plaintiffs request that the Court enter a judgment excepting their claims from Debtor's discharge pursuant to 11 U.S.C. § 523(a)(6) and granting such other and further relief as the Court deems just and proper.

Dated:  March 12, 2018

Respectfully submitted,

MANCUSO LAW, P.A.
*Counsel for Plaintiffs*
Boca Raton Corporate Centre
7777 Glades Rd., Suite 100
Boca Raton, Florida 33434
Tel: 561-245-4705
Fax: 561-226-2575
E-mail: ngm@mancuso-law.com

By: /s/ *Nathan G. Mancuso*
    Nathan G. Mancuso, Esq.
    Florida Bar No. 174254